Revised November 16, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 95-20871**

---

**BOBBY JAMES MOORE,**

**Petitioner-Appellee,**

**VERSUS**

**GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT**
**OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,**

**Respondent-Appellant.**

---

Appeal from the United States District Court
for the Southern District of Texas

---

October 27, 1999

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

ON REHEARING

Before SMITH, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

The original panel opinion (presently available at 185 F.3d 244 (5th Cir. Aug. 10, 1999)) is hereby withdrawn and replaced with the following.

The Director of the Texas Department of Criminal Justice,

Institutional Division appeals from the district court's final judgment granting Bobby James Moore's petition for habeas corpus relief from his capital sentence and remanding to the state court for a new punishment hearing.[1]  We affirm, as modified by this opinion, and remand with instructions.

I.

The district court's decision in this matter left the state trial court's judgment of guilt intact, but granted relief as to punishment only by reversing that portion of the state trial court's judgment imposing the death penalty and remanding to the state trial court for a new punishment hearing.  This is the second time we have been asked to review that decision.  Our first decision followed this Circuit's then-existing precedent by applying newly- enacted provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to Moore's petition, which was pending on the April 24, 1996 effective date of AEDPA.  *See* **Moore v. Johnson**, 101 F.3d 1069 (5th Cir. 1996), *vacated*, 117 S. Ct. 2504 (1997).  In that decision, we concluded that the district court failed to afford the state habeas court's fact findings the deference required by AEDPA's stringent standard of review.  *See* **Moore**, 101 F.3d at 1076; *see also* 28 U.S.C. § 2254(d)

---

[1] The Director has custody of appellee Bobby James Moore pursuant to a judgment and sentence of death entered by the 185th Judicial District Court of Harris County, Texas.

(providing that the Court may not grant habeas relief with respect to any claim that was adjudicated on the merits in a state court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States").

Shortly after our decision, the Supreme Court decided **Lindh v. Murphy**, 117 S. Ct. 2059 (1997). **Lindh** holds that the provisions of AEDPA relevant to this appeal do not apply to habeas corpus petitions that, like Moore's, were pending as of the April 24, 1996 effective date of AEDPA. **Lindh**, 117 S. Ct. at 2068. **Lindh** overrules this Circuit's pre-**Lindh** precedent, which held that AEDPA applied to habeas claims pending at the time AEDPA became effective. *See*, *e.g.*, **Drinkard v. Johnson**, 97 F.3d 751 (5th Cir. 1996); *see also* **United States v. Carter**, 117 F.3d 262 (5th Cir. 1997) (recognizing that **Lindh** overruled **Drinkard** and its progeny).

After our initial decision, Moore petitioned for and the Supreme Court granted a writ of certiorari, remanding the case to our Court for reconsideration in light of **Lindh** and the more lenient standards of review applicable under pre-AEDPA law.[2] *See*

---

[2] **Moore v. Texas**, 117 S. Ct. 2504 (1997). Although **Lindh** itself was a non-capital case, its holding extends to all cases potentially controlled by Chapter 153 of AEDPA, which is codified at 28 U.S.C. §§ 2241-2255. *See* **Lindh**, 117 S. Ct. at 2068 ("the new

3

28 U.S.C. § 2254(d) (1994) (providing that state habeas court fact findings are entitled to a presumption of correctness, but permitting a federal court to reject state habeas court fact findings that are "not fairly supported by the record"). Having concluded a thorough re-examination of the record, we find that the district court's judgment is correct when examined in light of the pre-AEDPA law applied therein. We therefore affirm the judgment of the district court as modified by this opinion.

## II.

The single issue before the Court for resolution is whether

---

provisions of Chapter 153 generally apply only to cases filed after the Act became effective"). AEDPA contains a separate chapter, Chapter 154, which is potentially applicable to habeas cases that were pending on AEDPA's effective date. *See* 28 U.S.C. §§ 2261-2266. Chapter 154 provides for an expedited disposition of capital habeas claims that is favorable to the state. Application of the more favorable provisions is conditioned, however, upon state compliance with statutory requirements intended to ensure that the habeas petitioner is afforded adequate counsel. Texas has not complied with the dictates of § 2261. Indeed, none of the three states within the geographic province of this Court have opted to comply with § 2261. For that reason, this Court has responded to **Lindh** by applying pre-AEDPA law in those capital cases that were pending at the time AEDPA became effective. *See*, *e.g.*, **Castillo v. Johnson**, 141 F.3d 218, 220 n.1 (5th Cir.), *cert. denied*, 119 S. Ct. 28 (1998); **Cannon v. Johnson**, 134 F.3d 683, 685 (5th Cir. 1998); **De La Cruz v. Johnson**, 134 F.3d 299, 301 (5th Cir.), *cert. denied*, 118 S. Ct. 2352 (1998); **Hogue v. Johnson**, 131 F.3d 466, 469 n.1 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1297 (1998); **Green v. Johnson**, 116 F.3d 1115, 1119 (5th Cir. 1997). Obviously, should the State of Texas opt to comply with the statutory dictates of chapter 154, this Court would be obliged to apply those provisions, without regard to whether the petition for habeas corpus relief was filed before the effective date of AEDPA.

4

Moore was deprived of his Sixth Amendment right to effective assistance of trial counsel during his 1980 capital trial. Moore claims that trial counsel were constitutionally deficient in their pretrial investigation of and presentation of a false alibi defense, and in their failure to investigate, develop, or present mitigating evidence during the guilt or punishment phase of his capital trial. Moore's ineffective assistance of counsel claim is governed by the familiar *Strickland* standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984).

"Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 2065. We therefore indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance. *Id*. at 2065-66. Such decisions are "virtually unchallengeable" and cannot be made the basis of relief on a Sixth Amendment claim absent a showing that

5

the decision was unreasonable as a matter of law. *See id*. at 2066; *Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992); *Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987). Strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 104 S. Ct. at 2066; *Whitley*, 977 F.2d at 157-58.

The district court concluded that Moore's counsel rendered constitutionally deficient performance at both the guilt and punishment phases of his trial, but found prejudice, and therefore granted relief, as to Moore's capital sentence only. The district court's decision is premised upon subsidiary findings that trial counsel were deficient in the two major areas identified by Moore. First, the district court found that counsel, in their presentation of an illogical and incredible alibi defense: (1) conducted an inadequate pretrial investigation, (2) ignored or excluded evidence that the offense was accidental, rather than intentional, (3) suborned perjury, and (4) elicited unduly damaging testimony against Moore on cross-examination of a state witness. Second, the district court found that counsel completely failed to investigate, develop, or offer available mitigating evidence, including previously redacted and exculpatory portions of Moore's purported confession, during the punishment phase of Moore's capital trial.

6

On appeal, the Director maintains that the district court impermissibly substituted its own de novo view of the state court record for binding state habeas court fact findings, thus failing to afford those fact findings the presumption of correctness required by the pre-AEDPA version of 28 U.S.C. § 2254(d). With respect to deficient performance, the Director maintains that both the decision to pursue an alibi defense and the decision not to present mitigating evidence were strategic decisions that are entitled to deference under **Strickland**. With respect to prejudice, the Director maintains that Moore cannot establish prejudice during the punishment phase of his trial on the basis of deficient performance during the guilt phase of his trial. Thus, the Director maintains that deficient performance arising from presentation of the alibi defense may not be imputed to the punishment phase of Moore's trial. The Director further argues that admission of the mitigating evidence proposed by Moore would not have affected the jury's decision to impose the death penalty. Finally, the Director argues that the district court exceeded its authority by remanding with instructions that the state court conduct a new punishment hearing.

Moore responds that the district court complied with 28 U.S.C. § 2254(d) by affording any relevant state habeas court fact findings the deference justified by the record in this case. *See* 28 U.S.C. § 2254(d)(8) (1994) (providing that the federal court

7

may, after a review of the relevant record, reject state habeas court fact findings that are "not fairly supported by the record"). Moore further responds that the record reflects counsel did not make fully informed strategic decisions with regard to the presentation of the alibi defense or the failure to present mitigating evidence. To the contrary, Moore responds that counsel failed to properly investigate the controlling facts and law, both as to guilt and as to punishment, with the effect that available and availing evidence was never developed. Moreover, Moore responds that counsel's decision to exclude the potentially exculpatory evidence that was developed was both professionally unreasonable and based upon an erroneous understanding of the controlling legal principles. Thus, Moore maintains that there are no reasonable strategic decisions entitled to this Court's deference under **Strickland**. With respect to prejudice, Moore maintains that there is a reasonable probability that, but for counsel's deficient performance at both the guilt and punishment phases of his capital trial, the jury would have reached a different decision with respect to the appropriate sentence in his case. Accordingly, Moore argues in support of the district court's determinations that trial counsel were ineffective in their pretrial investigation and presentation of the alibi defense, and in their failure to investigate, develop or present mitigating evidence during the punishment phase of Moore's trial.

8

Significantly, Moore has not cross-appealed. We are therefore limited to a review of the district court's decision that there is a reasonable probability that but for counsel's deficient performance at either the guilt phase or the punishment phase or both, Moore would not have been sentenced to death. Given the absence of a cross-appeal, the district court's decision that Moore failed to demonstrate prejudice as to the guilt phase of his capital trial is not before this Court for review, and we are not at liberty to expand upon the relief granted by the district court. *See United States v. Coscarelli*, 149 F.3d 342 (5th Cir. 1998) (en banc).

Having reviewed the record and the arguments of the parties we affirm, with some modifications, the district court's determination that counsel's performance was deficient during the guilt phase of Moore's trial. We likewise affirm the district court's determination that counsel's failure to investigate, develop or present mitigating evidence including exculpatory evidence that the offense was accidental, during either phase of Moore's capital trial, constituted constitutionally deficient performance that prejudiced the outcome of the punishment phase of Moore's trial. Accordingly, we affirm the district court's grant of relief.

We agree, however, with the Director that the district court exceeded its authority by ordering the state court of conviction to conduct a new punishment hearing. The decision whether to pursue

a new punishment hearing pursuant to Texas Code of Criminal Procedure article 44.29(c) is vested with the state court of conviction. We therefore remand for entry of an order granting the writ of habeas corpus, but permitting the state court of conviction a reasonable time in which to cure the constitutional error by imposing a sentence of less than death or conducting a new punishment hearing as authorized by Texas state law.

## III.

Moore's case has been pending, in one court or another, for almost twenty years. An extensive review of the various proceedings, including the evidence adduced at Moore's trial, is essential to an understanding of our disposition.

A. The Offense

Moore was convicted of capital murder for the death of Jim McCarble, which was committed in the course of a bungled robbery of the Birdsall Super Market in Houston, Texas on April 25, 1980. On that day, McCarble and his fellow employee Edna Scott were working in the courtesy booth at the front of the store. Arthur Moreno and Debra Salazar were checking groceries at nearby registers. Three men, later identified as Willie "Rick" Koonce, Everett Anthony Pradia, and petitioner Moore, entered the store. Koonce, who was identified in pretrial line-ups and at trial by several witnesses, entered the courtesy booth with a white cloth bank bag and ordered McCarble to "[f]ill it up, man. You being robbed." McCarble then

10

jumped to the left of Scott, which allowed Scott to see a second man, later identified as Moore, standing outside the courtesy booth and pointing a shotgun in her direction. The man holding the shotgun was wearing a wig and sunglasses, which together with the shotgun, obscured part of his face. The shotgun itself was partially wrapped in two plastic bags. Neither Scott nor Moreno nor Salazar was able to positively identify Moore as the man holding the shotgun at either the pretrial line-up or at trial. Scott testified that the man with the shotgun must have been significantly taller than herself because she was able to look directly into his eyes, notwithstanding the fact that she was standing on the floor of the elevated courtesy booth. At trial, it was demonstrated that Moore was approximately the same height, if not slightly shorter, than Scott. Salazar's testimony on the issue of identity was the strongest. Salazar initially testified that she was certain that Moore was the man pointing the shotgun into the courtesy booth. But Salazar later qualified her testimony by stating that she was not certain and could be mistaken. Leonard Goldfield, the manager of the Birdsall Super Market, testified that he only saw two men whom he suspected of participating in the robbery. Goldfield positively identified those two men as Koonce and Pradia.

When Scott observed the man with the shotgun, she shouted to the assistant manager that there was a robbery in progress and then dropped to the floor of the courtesy booth. Pradia, sensing that

11

the robbery was going wrong, fled the store. Moreno and Salazar testified that they observed the man with the wig rise up on his toes and aim the shotgun down into the courtesy booth. Scott testified that she heard the shotgun discharge and observed McCarble, who sustained a fatal wound to the head, fall to the floor beside her.

Koonce and Moore fled the store. On the way to the car, Moore dropped one of the plastic bags covering the gun and the wig he was wearing. Store customer Wulfrido Cazares observed the three robbers get into a red and white car and made a mental note of the license plate number. Cazares had the letters memorized, but had two alternative configurations for the numerical portion of the license plate. When those numbers were later given to the police, one of the numbers was registered to a red and white Mercury Cougar belonging to Koonce.

B. The Investigation

The plastic bag and wig dropped by the shooter were later recovered from outside the store by police. Police also recovered a second plastic bag that was left at the front of the courtesy booth. The bag found in front of the courtesy booth contained a second wig. One of the bags was found to contain a sales receipt issued to Betty Nolan. The receipt was traced and police interviewed Nolan. Nolan told the police that petitioner Moore sometimes lived at her house, sharing a room with her son Michael Pittman. Nolan told one of the officers that Moore had been at

12

Nolan's house on the day of the offense. Moore and his sister both testified that Moore moved out of Nolan's house several months before the offense because he had an argument with Pittman. Moore and his sister also testified that he could not have returned to the house because Nolan changed the locks after the argument between Moore and Pittman.

Police searched Nolan's home and recovered a shotgun between the mattress and box springs of Moore's bed. A ballistics expert testified at trial that it is impossible to determine whether a particular shotgun was used in an offense by examining the projectiles, or shot, from the shotgun. Thus, the expert was unable to determine, from the size 8 shot recovered from the floor of the courtesy booth and from McCarble's head, whether the shotgun recovered from Nolan's house was the weapon used to kill McCarble. Several witnesses testified, however, that the shotgun recovered from Nolan's home was similar to or looked like the weapon that was aimed into the courtesy booth during the robbery. The ballistics expert also testified that one of the shells found with the shotgun contained size 8 shot and that a single expended shell found with the shotgun had indeed been fired from the shotgun recovered from Nolan's house.

Police were unable to find suitable fingerprints for comparison to Moore's on either the shotgun or the plastic bags. Moore testified that Pittman owned the shotgun, which had been stolen from one of Pittman's former employers. The state did not

13

offer any evidence relating to whether the gun was registered or whom the gun was registered to. Moore also testified that, according to Pradia, Pittman was the third man who held the shotgun during the robbery. Moore testified that Pittman had four prior robbery convictions. Evidence offered at trial established that Pittman was then incarcerated pursuant to a judgment of criminal conviction for burglary of a building.

Police also discovered that Nolan had several wigs and wig stands in her home. Photographs were made of six wig stands. Of the six stands, only four had wigs. Thus, two wigs, the number found at the crime scene, were missing. The two wigs secured at the crime scene were tested for hair samples. Although some small pieces of hair were obtained, the samples were too small for any meaningful comparison to exemplar hairs from Moore's head.

Meanwhile, police arrested Koonce based upon the store customer's description of the robbers' car and license plate number. Koonce gave a confession implicating Pradia and Moore. Pradia's billfold was found in Koonce's car. When Pradia heard police were looking for him, he turned himself in. Pradia also gave a confession, and like Koonce, Pradia implicated Moore in the robbery.

14

C.   Moore's Arrest and Interrogation

Based upon information received from Koonce and Pradia and the evidence obtained from Nolan's house, police obtained an arrest warrant for Moore.   Around the same time, police received a telephone call from citizen Bobby White, who was an acquaintance of Moore's father, Ernest "Junior" Moore.   White told police that he had accompanied Junior Moore and petitioner Bobby Moore to Moore's grandmother's house in Coushatta, Louisiana on the morning of Tuesday, April 29, 1980, four days after the robbery and around the time of Koonce's and Pradia's arrest.   White told police that Moore took luggage and that he remained in Coushatta when Junior Moore and Bobby White returned to Houston on Wednesday, April 30, 1980. Moore was still in Coushatta when Bobby White and Junior Moore made a second trip to the grandmother's house on May 1 and 2.   When White returned to Houston from the second trip, on Friday, May 2, 1980, he called the Houston police and told them that Bobby Moore was in Coushatta at his grandmother's house.

Houston police contacted the Louisiana State Police, who arrested Moore at his grandmother's house.  On May 5, 1980, Houston Police Officers D. W. Autrey and Larry Ott, who had been investigating the robbery, traveled to Louisiana to bring Moore back to Houston.   Once the trio returned to Houston, Moore was interrogated about his role in the crime.  The Director claims that this interrogation resulted in Moore's confession, which was introduced at trial.  Moore claims that, although he was beaten to

15

induce his cooperation, he never signed a written statement. Moore introduced a booking photo of himself taken three or four days after the interrogation that reflects some swelling on the left side of his face and head. Photos taken of a pretrial line-up done on May 7, 1980, however, do not show any appreciable distortion in Moore's features.

D.   The Trial

Moore's case was called to trial in July 1980. Moore was defended by Alfred J. Bonner, who was retained and paid by Moore's family, and C. C. Devine. Early in the trial, the state attempted to introduce Moore's confession through Officer Ott. Moore's counsel objected and the jury was removed from the courtroom while the trial court considered whether Moore's confession would be admitted into evidence.

Moore's purported confession recites that Koonce, Pradia, and Moore were riding around in Koonce's car looking for some place to rob. After casing the store, the three men decided that Koonce would enter the courtesy booth, that Pradia would remove money from the registers, and that Moore was to guard the courtesy booth and the front door with his shotgun. The confession recites that Moore wore a wig and covered the shotgun with two plastic shopping bags before entering the store. When Scott started shouting that there was a robbery in progress, Moore shouted to Koonce that it was time

16

to leave.  When Koonce did not respond, Moore approached the front of the courtesy booth.  About the actual shooting, the confession states:

> The old man in the booth leaned over to open a drawer in the booth.  I started trying to push him back with the barrel of the shotgun.  I was leaning over the counter of the booth and I suddenly fell backwards and the butt of the gun hit my arm and the gun went off.  I didn't learn until later that the man had been shot.  I seen it on T.V.  The man must have been standing back up as I fell backwards and the gun went off.

After the robbery, the confession states that the three men ran out of the store and drove to Betty Nolan's house.  Moore stayed at Nolan's and Pradia and Koonce left.  The confession also states:

> I swear I was not trying to kill the old man and the whole thing was an accident.

Officer Ott stated on voir dire by the state that both the inculpatory portions of the confession, demonstrating Moore's involvement, and the exculpatory portions of the confession, tending to establish that the shooting was an accident, were verbatim recitals of Moore's voluntary statements concerning his participation in the crime.  Officer Ott testified that he typed Moore's confession, which was executed on blue paper.

Moore testified on voir dire that he had refused to sign any statement or confession.  Moore further testified that his refusal so angered the interrogating officers that he was struck repeatedly on the left side of his face.  Moore conceded that he eventually signed two pieces of blank white paper, but only because the

17

officers told him he would be released if he did so. Moore testified that he had not signed anything printed on blue paper and that the signature on the blue confession being offered by the state was not his own.

Moore's counsel argued that the confession was inadmissible, either because it was not signed by Moore or because it was involuntarily given. The trial court denied Moore's motion to suppress and the confession was deemed admissible. Before the jury was brought back in, however, the state informed the trial court that it wished to exclude the exculpatory portions of the confession quoted above, which tended to establish that the shooting was accidental. Moore's defense counsel stated that they had not reached a decision with respect to whether they would be offering the remainder of the confession. Moore's counsel secured a ruling from the trial court prohibiting the state from making any reference to the portions of the confession that were being omitted until that decision could be made. In response, the state agreed to merely cover the exculpatory language when entering the inculpatory portions of the confession, thus preserving the language for later use by the defense. Once that agreement was reached, however, Moore's counsel inexplicably changed course, stating that they would not use the exculpatory portions of the confession and that those portions should be completely "cut out" of the exhibit given to the jury. As a result, the exculpatory passages in the confession were "whited out," and the confession

18

presented to the jury contained no mention of the actual shooting. Rather, the confession placed Moore at the crime scene, holding a shotgun pointed in McCarble's direction, and then, following a conspicuously large blank space where the exculpatory text was deleted, the confession described how the three men fled the store. Defense counsel's failure to offer the exculpatory portions of Moore's confession, at either the guilt phase or the punishment phase of Moore's trial, forms a significant part of Moore's claim that he received ineffective assistance of counsel.

In addition to the evidence described above, the state also offered Pradia's testimony against Moore in its case-in-chief. Pradia testified pursuant to a plea bargain. Pradia testified that the three men met at Betty Nolan's house on the morning of April 25, 1980, and then rode around in Koonce's car deciding upon a store to rob. Pradia testified that he cased the store before the robbery by going in to see who was working and whether the robbery was feasible. Pradia's testimony was corroborated by the testimony of store employees who testified that they observed Pradia in the store earlier in the day. Pradia's testimony was also consistent with many details contained in the inculpatory portions of Moore's confession which were submitted to the jury. Pradia told the jury that when Koonce and Moore joined him in the car after the robbery, Moore told Pradia that Moore shot someone inside the store. Pradia testified that he did not believe Moore until he saw the news coverage about McCarble's death.

Moore's counsel pursued an alibi defense. Moore claims in this habeas action that his trial counsel knew that Moore's confession was true; that is, that Moore participated in the robbery and that he unintentionally shot Jim McCarble. Moore maintains that counsel nonetheless created a false alibi defense, and then pressured Moore and his sisters Clara Jean Baker and Colleen McNiese to testify falsely that Moore was in Coushatta, Louisiana at his grandmother's house on April 25, 1980, the date of the offense. Clara Jean Baker and petitioner Moore eventually testified before the jury in support of the fabricated defense.

Without regard to whether counsel knowingly suborned perjured testimony, as Moore alleges, the presentation of the alibi defense can only be described as pathetically weak. Moore's sister, Baker, initially testified that she drove Moore to Coushatta, Louisiana on April 14, 1980 and picked him up the next Monday, April 21, 1980. The problem with that testimony, of course, is that it did not place Moore in Louisiana on the offense date, April 25, 1980. Baker then changed her testimony to state that she drove Moore to Louisiana on Monday, April 21, and did not pick him up until Monday, April 28, 1980. Baker testified that Moore went to Louisiana to care for his grandmother because Moore's grandmother was ill. Baker testified that she went to get him the next week because he was bored. Notwithstanding Moore's boredom in Louisiana, Baker testified that she was aware Moore returned to Louisiana the following morning, Tuesday, April 29, 1980, with his

20

father, Junior Moore, and Bobby White.

Moore also testified in support of the false alibi, telling the jury that he was in Louisiana on the date of the alleged offense. But on cross-examination, Moore testified that he was certain he went to Louisiana on Monday, April 21, 1980, and that he stayed there only four or five days. When confronted with the fact that he could have therefore been back on April 25, the day of the offense, Moore backtracked and said he returned with his sister Baker on either April 26 or April 27. Thus, Moore's own testimony conflicted with that of Baker's with respect to when he returned to Houston. That inconsistency was compounded by Moore's further testimony that he returned to Louisiana with his father and Bobby White on the same day he returned to Houston, rather than the following day, as Baker had testified. Moore also repeated in substance his voir dire testimony concerning the circumstances of his arrest and interrogation, and his denial of the written confession. Defense counsel attempted to bolster the floundering alibi defense with the testimony of Houston Police Officer J. H. Binford, who verified that neither Edna Scott nor Debra Salazar nor Arthur Moreno was able to identify Moore in a pretrial line-up as a person who participated in the robbery.

Not surprisingly, the state responded to Moore's alibi defense on rebuttal with evidence relating to extraneous conduct and offenses involving similar conduct. *See*, *e.g.*, **Hughes v. State**,

21

962 S.W.2d 89, 92 (Tex. App.--Houston [1st Dist.] 1997, pet. ref'd) (subject to certain exceptions, evidence of similar extraneous conduct may be admissible on the issue of identity once a defendant raises an alibi defense). The state first used its cross-examination of Moore to catalogue Moore's prior convictions, three for burglary and one for aggravated robbery. The state also called three witnesses to two separate robberies of small grocery stores in the Houston area. Those robberies occurred on April 11 and April 18, 1980, the two Fridays preceding the Friday, April 25, 1980 robbery of the Birdsall Super Market. Store employees positively identified Moore as being one of the perpetrators at both robberies. As to the first robbery, a store employee testified that Moore and two other black men entered the store, and that Moore stood at the front of the courtesy booth holding a shotgun. As to the second robbery, a store employee and a store customer testified that Moore and another black man entered the store, and that Moore held a shotgun during the robbery. This very damaging testimony became admissible only because Moore pursued an alibi defense. There is no dispute that the evidence would not have been admissible had Moore pursued an accidental shooting defense instead. The state also called a Louisiana State Police Officer who knew Moore's grandmother very well and who arrested Moore at his grandmother's house. That officer testified that, contrary to Moore's testimony and that of his sister, Moore's grandmother was and had been in good health. The officer also

22

testified that he had not seen Moore at the grandmother's house or in the vicinity of the small town of Coushatta before the date of arrest.

Closing arguments followed. The state argued that Moore's confession was voluntary. The state also argued that Moore's confession was accurate, at least as to those portions submitted to the jury. Contrary to its pre-submission agreement, the state referred to the obviously omitted portions of the confession, stating that the confession was edited because the state did not want to vouch for exculpatory language Moore included in his confession. Notwithstanding that position, the state argued that Officer Ott would not have included exculpatory language in a fraudulently prepared confession. Thus, the state relied upon the existence of the undisclosed and excised exculpatory language to support its argument that the confession was voluntary. The state did not, however, clarify that the excluded language supported an accidental shooting theory. To the contrary, the state tried to negate any such impression by emphasizing that there had been no contention in the case that the shooting was accidental.

Defense counsel Devine and Bonner made separate arguments, which were in part contradictory. For example, Devine criticized the police and their investigation while Bonner said he had no complaint against the police. Devine's argument was consistent with Moore's alibi defense. But Bonner essentially abandoned the alibi defense, stating that it made no difference whether Moore's

23

sister testified truthfully or whether Moore's grandmother was in fact in ill health. Bonner characterized the evidence relating to Moore's alibi as nothing more than a series of "rabbit trails." Bonner placed his focus instead upon the alleged forgery of Moore's confession, and upon whether the state's other evidence was strong enough to place Moore at the Birdsall Super Market on April 25, 1980.

The state's rebuttal argument relied heavily upon the pitiful failure of the alibi defense. The state also emphasized and made use of defense counsel's apparent inability to agree, and their divergent positions in closing argument to the jury.

During deliberations, the jury sent out a note requesting that they be provided with "[b]oth confessions of the Defendant." Notwithstanding that request and the available argument that the state opened the door to submission of Moore's unredacted confession by relying upon redacted portions in its closing argument, the state and defense counsel submitted, by agreement, only the redacted confession. Three hours later, the jury returned a verdict of guilty.

The punishment phase of Moore's trial began immediately. Under Texas law, Moore's jury was required to return affirmative answers to each of two special issues before the death penalty could be imposed. Those issues were:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that

24

the death of the deceased or another would result; and

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

The state began by tendering all of the state's guilt phase evidence into the punishment phase record. The state then offered Moore's penitentiary package, which contained the details of Moore's prior criminal record. The state was permitted to explain the penitentiary package to the jury, and the jury was again instructed that Moore had three prior burglary convictions and one prior aggravated robbery offense. Moore's counsel did not likewise offer any explanatory argument to the jury on the penitentiary package, notwithstanding that: (1) Moore was sentenced for each of the four offenses on the same day; (2) Moore began serving his sentence for each of the four convictions on the same day; and (3) Moore was released from serving the balance of the four concurrently imposed sentences after only two years, a factor clearly relevant on the issue of future dangerousness. To the contrary, Moore's counsel simply stipulated that the documents comprising the penitentiary package were accurate. Besides failing to respond to the state's evidence, defense counsel offered no evidence on the issue of punishment. The evidentiary portion of the punishment phase of Moore's capital punishment trial concluded less than ten minutes after it had begun.

Counsel then made closing arguments to the jury. Once again,

25

defense counsel Devine and Bonner made separate and somewhat contradictory arguments. Devine argued that the shooting was accidental and unintentional. Devine supported that position with argument relating to the nature and the location of McCarble's wound, the small amount of pressure required to discharge a firearm, and other circumstances of the offense. Devine did not, however, support that punishment phase argument with the best available evidence that the shooting was indeed accidental -- Moore's unredacted confession -- even though the record is clear that an unredacted version of the confession was available and could have been offered during the punishment phase of Moore's trial. Devine also argued that Moore would not present a continuing threat of violence in the prison community. Devine failed, however, to support that argument by focusing the jury upon evidence in the penitentiary package that Moore was released early from his only prior prison sentence.

Bonner encouraged the jury not to make too much from defense counsel's apparent disagreement. Bonner seemed to deride Devine's accidental shooting theory, stating that Devine only argued the theory for the purpose of ensuring that defense counsel were not lax in their duty. Contrary to both Moore's confession and the jury's verdict, Bonner then attempted to focus the jury on the defensive theory that the state's evidence failed to show Moore was at the scene of the crime. Neither Devine nor Bonner argued the alibi defense that featured so prominently at the guilt phase of

26

trial. Together, Devine's and Bonner's arguments take up less than fifteen pages of the punishment phase transcript.

The state closed by highlighting defense counsel's failure to try and explain away Moore's prior offenses, defense counsel's failure to call character witnesses, and the brevity of defense counsel's argument on the issue of punishment. The state relied upon defense counsel's failure to offer these types of evidence as support for the proposition that no such evidence existed. After deliberation, the jury returned affirmative answers to the special issues as required under Texas law for imposition of the death penalty.

One week later, Moore was sentenced to death. At sentencing, counsel Devine expressed the desire to withdraw from his representation of Moore. Devine died shortly thereafter. Bonner expressed the desire to continue representing Moore on appeal, provided the trial court would provide a record for that purpose.

E.    Direct Appeal

Moore's case was automatically appealed to the state's highest criminal court, the Texas Court of Criminal Appeals. In the two and one-half year period between December 1980 and June 1983, Bonner filed at least twelve motions seeking an extension of the filing deadline for either Moore's appellate brief or the statement of facts. During that period, Bonner routinely missed filing deadlines, failing to request an extension of time until he received notice that the filing deadline had passed. Between

27

January and April 1983, Moore sent letters and pro se motions to the Texas Court of Criminal Appeals complaining that Bonner refused to communicate with him and requesting permission to file a pro se brief on appeal.  Moore's pro se motions were denied.  In May 1983, Bonner requested a "final" extension of the brief filing deadline until July 15, 1983.  Bonner missed this deadline as well, and did not file a brief on Moore's behalf until July 27, 1983, three years after Moore's capital trial.  The state filed a timely response brief in August 1983.

Meanwhile, Moore continued to send correspondence to the Texas Court of Criminal Appeals objecting to Bonner's representation.  In October 1983, the Texas Court of Criminal Appeals ordered the trial court to conduct a hearing to determine whether Moore was making an informed decision to proceed pro se on appeal.  In December 1983, the trial court conducted a hearing to determine whether Bonner should continue as Moore's counsel.  Moore rejected Bonner's representation and requested that another lawyer be appointed.  Accordingly, attorney John Ward was appointed to replace Bonner as Moore's counsel on appeal.

Between January 1984 and September 1984, counsel Ward filed four additional motions for an extension of the brief filing deadline.  The Texas Court of Criminal Appeals granted those motions.  The final extension made the brief due on October 3, 1984.  Ward missed the October 3 filing deadline.  In December 1984, the Texas Court of Criminal Appeals issued a show cause order

28

instructing Ward to file the brief before January 7, 1985, or to show cause why he should not be held in contempt of court. Ward eventually filed the brief on the January 7, 1985 deadline. Ward's brief argued, inter alia, that Moore's trial counsel rendered ineffective assistance because they failed to investigate the availability of mitigating background evidence and failed to present available mitigating evidence at the punishment phase of Moore's capital trial.

During the time period for the state's response, Moore filed a pro se brief on his own behalf. Moore's pro se brief argued, inter alia, that trial counsel were ineffective for failing to call additional alibi witnesses, such as his grandmother and his father.

In October 1985, more than five years after Moore's capital trial, the Texas Court of Criminal Appeals issued an opinion affirming Moore's conviction and death sentence. *See* **Moore v. State**, 700 S.W.2d 193 (Tex. Crim. App. 1985). Noting the abundance of briefs on appeal, the Texas Court of Criminal Appeals purported to reach all of the arguments presented in the various briefs filed by Bonner and Ward, and by Moore acting pro se. While the Court made certain rulings with respect to Ward's ineffective assistance of counsel argument, the Texas Court of Criminal Appeals expressly limited those holdings by noting that the record on direct appeal is generally inadequately developed to reflect trial counsel's failings. *See* **Moore**, 700 S.W.2d at 204-05. Without precluding the

possibility that Moore's ineffective assistance of counsel claims might be beneficially developed in further proceedings, the Texas Court of Criminal Appeals set forth rulings expressly "limited to the record on appeal that is before us." *Id*. at 205. Moore's execution date was thereafter set for February 26, 1986. Moore's petition to the Supreme Court for writ of certiorari and his application for stay of execution were denied on February 21, 1986. *Moore v. Texas*, 106 S. Ct. 1167 (1986).

F.    Habeas Corpus Proceedings

On February 24, 1986, Moore, represented by new counsel, filed an application for writ of habeas corpus and a motion for stay of execution in state court. The state trial court denied both Moore's application for habeas corpus and Moore's motion for a stay of the February 26 execution date without a hearing. The Texas Court of Criminal Appeals summarily affirmed that decision without opinion.

On February 25, 1986, Moore filed a petition for habeas corpus relief and a motion for stay of execution in federal district court. The district court granted Moore a stay of execution. In June 1987, the district court determined that Moore's federal habeas petition raised certain factual and legal theories that had not been presented to the state courts. Accordingly, the district court dismissed Moore's first federal habeas petition, without prejudice to refiling upon exhaustion.

30

In April 1992, Moore, now represented by three new lawyers, filed his second application for state habeas relief. Moore's April 1992 petition alleged, inter alia, that Moore's trial counsel: (1) suborned perjury in the presentation of Moore's alibi defense; (2) failed to conduct an adequate pretrial investigation by interviewing Koonce and Pradia and state witnesses to extraneous conduct; (3) excluded exculpatory evidence that the shooting was accidental on the basis of their erroneous belief that such evidence was per se inconsistent with Moore's alibi defense; (4) unduly prejudiced Moore by eliciting damaging testimony on essential elements of the offense that was not otherwise introduced against Moore in their cross-examination of Officer Autrey; and (5) failed to investigate, develop, or present available mitigating evidence that would have swayed the jury's decision on the special issues in Moore's favor.

On April 23, 1993, the state habeas court conducted an evidentiary hearing on Moore's various ineffective assistance of counsel claims. The state habeas court heard evidence from Bonner, Moore, Moore's sisters Clara Jean Baker and Colleen McNiese, and other witnesses concerning trial counsel's conduct. The state habeas court also heard substantial evidence from an expert witness and Moore's family members concerning Moore's tortured family background and his impaired mental functioning. After the evidentiary hearing, the state habeas court entered findings of fact and conclusions of law in support of its determination that

Moore did not receive ineffective assistance of counsel at his 1980 trial.  On October 4, 1993, the Texas Court of Criminal Appeals affirmed the state habeas court's denial of habeas corpus relief.

On October 12, 1993, Moore filed his second federal petition for federal habeas relief, raising the same claims that were presented in the second state habeas application.  On October 21, 1993, the district court denied Moore's request for an evidentiary hearing, reserving the right to revisit the issue should a hearing become necessary.  On September 29, 1995, the district court entered an order holding that Moore's trial counsel rendered deficient performance at both the guilt and punishment phases of Moore's trial, and that counsel's deficient performance prejudiced Moore at the punishment phase of his trial.  Accordingly, the district court reversed the state court judgment against Moore as to punishment only, and remanded to the state trial court for a new punishment hearing.  The Director appeals from that decision.

IV.

In making its determination that Moore received ineffective assistance of counsel, the district court adopted some, but considered and rejected other, factual determinations made by the state habeas court.  The Director contends that the district court failed to afford these state habeas court fact findings the deference required by the pre-AEDPA version of 28 U.S.C. § 2254(d).

The Director first argues that a federal district court may

32

not reject the factual determinations made by a state habeas court without conducting its own evidentiary hearing. We disagree. "Although the federal district courts are vested with broad power on habeas to conduct evidentiary hearings, we cannot say that it becomes the duty of the court to exercise that power where, as here, the state trial court has afforded the applicant[] a full and fair evidentiary hearing." *Heyd v. Brown*, 406 F.2d 346, 347 (5th Cir. 1969); *see also West v. Johnson*, 92 F.3d 1385, 1410 (5th Cir. 1996); *Lincecum v. Collins*, 958 F.2d 1271, 1278-80 (5th Cir. 1992); *Winfrey v. Maggio*, 664 F.2d 550 (5th Cir. Unit A Dec. 1981) (all holding that the federal district court is not required to hold an evidentiary hearing when the record is clearly adequate to fairly dispose of the claims presented). We find no error arising solely from the fact that the district court chose to review the state habeas court's factual determinations without conducting an evidentiary hearing on Moore's claims.[3]

The Director also contends that the district court impermissibly substituted its own view of the facts for state habeas court findings entered after a full and fair litigation of Moore's claims in the state habeas court. Essentially, this amounts to a contention that the district court failed to correctly

---

[3] Given Moore's failure to cross-appeal, we do not decide whether conflicts in the testimony before the state habeas court supported Moore's request for an evidentiary hearing in the district court.

33

apply the pre-AEDPA version of 28 U.S.C. § 2254(d). We will first define the deference required by the pre-AEDPA version of § 2254(d). Whether the district court inappropriately rejected particular findings will be addressed in the context of the specific areas of deficient performance identified by the district court.

The pre-AEDPA version of 28 U.S.C. § 2254(d) obligates federal habeas courts to afford state habeas court fact findings a presumption of correctness, subject to an enumerated list of eight exceptions. *See* 28 U.S.C. § 2254(d)(1)-(8) (1994). The first seven exceptions in essence provide that the presumption of correctness does not apply unless the petitioner's habeas claims have been fully and fairly litigated in a state habeas court with jurisdiction to consider the matter.[4] We have already determined, and the parties do not dispute, that Moore's ineffective assistance of counsel claims received a full and fair adjudication on the

---

[4] *See* 28 U.S.C. § 2254(d)(1) (1994) (presumption inapplicable when the state habeas court failed to resolve the merits of a factual dispute); *id.* § 2254(d)(2) (presumption inapplicable when state habeas court employed inadequate fact finding procedure); *id.* § 2254(d)(3) (presumption inapplicable when material facts are not adequately developed in state habeas proceeding); *id.* § 2254(d)(4) (presumption inapplicable when state habeas court lacked jurisdiction); *id.* § 2254(d)(5) (presumption inapplicable when state habeas court deprived petitioner of his constitutional right to counsel by failing to appoint counsel for an indigent petitioner); *id.* § 2254(d)(6) (presumption inapplicable when petitioner's claim was not fully and fairly litigated in state habeas court); *id.* § 2254(d)(7) (presumption inapplicable if petitioner was otherwise denied due process of law in the state habeas proceeding).

34

merits in the April 1993 evidentiary hearing conducted in the state habeas court.  *See **Moore***, 101 F.3d at 1075.  We therefore conclude that none of the seven exceptions set forth as § 2254(d)(1) through § 2254(d)(7) are applicable in this case to excuse the presumption of correctness otherwise required by § 2254(d).

Instead, the district court expressly tied its selective rejection of the state habeas court's factual determinations to § 2254(d)(8), the final exception in § 2254.  Section 2254(d)(8) provides that federal habeas courts need not defer to state habeas court fact findings that the federal habeas court determines are "not fairly supported by the record."  *See* 28 U.S.C. § 2254(d)(8) (1994); ***Bryant v. Scott***, 28 F.3d 1411, 1417 (5th Cir. 1994).  Under this pre-AEDPA standard, a federal habeas court may not reject state court factual determinations merely on the basis that it disagrees with the state court's resolution.  ***Marshall v. Lonberger***, 103 S. Ct. 843, 850 (1983); ***Loyd v. Smith***, 899 F.2d 1416, 1425 (5th Cir. 1990).  Indeed, the federal court may not reject factual determinations unless it determines that they lack even "fair support" in the record.  ***Marshall***, 103 S. Ct. at 850; ***Smith***, 899 F.2d at 1425.  But the deference embodied in the pre-AEDPA version of § 2254(d) does not require that the federal court place blinders on its eyes before conducting a habeas corpus review of a state record.  To the contrary, the section merely erects a starting place or presumption, that may be examined in light of the

35

state court record.  *See*, *e.g.*, **Bryant**, 28 F.3d at 1417-19.  It is worth noting that the pre-AEDPA standard is significantly less deferential to state habeas court factual determinations in this regard than its AEDPA counterpart, which prohibits the grant of relief unless the state court's factual determination is plainly unreasonable in light of the evidence submitted to the state habeas court.  *See* 28 U.S.C. § 2544(d)(2); **Trevino v. Johnson**, 168 F.3d 173, 181 (5th Cir. 1999), *pet. for cert. filed*, (U.S. June 17, 1999) (No. 98-9936).

In addition, § 2254(d) does not require a federal habeas court to defer to a state court's legal conclusions.  Once again, the pre-AEDPA standard permits, in this regard, a far more liberal review of state habeas court findings than is allowed by the stringent standard of review embodied in AEDPA's version of § 2254(d).  Under AEDPA, a state court's legal conclusion may not be disturbed absent a showing that the state court conclusion is contrary to, or involved an unreasonable application of, clearly established law, as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  An application of federal law is unreasonable only when "reasonable jurists considering the question would be of one view that the state court ruling was incorrect."  **Trevino**, 168 F.3d at 181 (quoting **Drinkard**, 97 F.3d at 769).  Thus, AEDPA's standard of review both restricts the federal habeas court's review of state factual determinations, and interjects

certain limitations upon the federal habeas court's review of legal conclusions that were not present under pre-AEDPA law.

When applying the pre-AEDPA standard to ineffective assistance of counsel claims, this Court has held that whether counsel was deficient, and whether the deficiency, if any, prejudiced the petitioner within the meaning of *Strickland*, are legal conclusions which both the district court and this Court review de novo. *See Bryant*, 28 F.3d at 1414 ("a state court's ultimate conclusion that counsel rendered effective assistance is not a fact finding to which a federal court must grant a presumption of correctness"); *see also Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1567 (1998); *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994); *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992); *Mattheson v. King*, 751 F.2d 1432, 1439 (5th Cir. 1985). The state court's subsidiary findings of specific historical facts and state court credibility determinations are, however, entitled to a presumption of correctness under § 2254(d). *Carter*, 131 F.3d at 4643; *Bryant*, 28 F.3d at 1414 n.3. Thus, a state habeas court's determination that counsel conducted a pretrial investigation or that counsel's conduct was the result of a fully informed strategic or tactical decision is a factual determination, while the adequacy of the pretrial investigation and the reasonableness of a particular strategic or tactical decision is a question of law, entitled to de novo review. *See Horton v.*

37

*Zant*, 941 F.2d 1449, 1462 (11th Cir. 1992); *see also* **Bryant**, 28 F.3d at 1414-19; **Whitley**, 977 F.2d at 158-59; **Wilson**, 813 F.2d at 672.

The Court is, therefore, not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all. *Compare* **Mann v. Scott**, 41 F.3d 968, 983-84 (5th Cir. 1994) (citing record evidence for proposition that counsel made a strategic decision not to offer mitigating evidence during the punishment phase of a capital trial), *with* **Whitley**, 977 F.2d at 157-58 (concluding from the record that counsel's failure to offer mitigating evidence during the punishment phase of habeas petitioner's capital trial was not the result of a considered strategic decision, and therefore not entitled to deference), *and* **Wilson**, 813 F.2d at 672 (concluding that the existing record was inadequate for purposes of determining whether counsel made a strategic decision not to offer mitigating evidence during the punishment phase of a capital trial or whether that decision was professionally reasonable); *see also* **Whitley**, 977 F.2d at 158 ("The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court."); **Profitt v. Waldron**, 831 F.2d 1245, 1248 (5th Cir. 1987) (**Strickland**'s measure of deference "must not be watered down into a disguised form of

acquiescence."); *id*. at 1249 (refusing to indulge presumption of reasonableness as to "tactical" decision that afforded no advantage to the defense). Rather, the fundamental legal question is whether, viewed with the proper amount of deference, counsel's performance was professionally reasonable in light of all the circumstances. *Strickland*, 104 S. Ct. at 2066.

Having set forth the factual background of this case and the appropriate standards governing both Moore's substantive claim that he received ineffective assistance of counsel and the district court's treatment of relevant findings by the state habeas court, we now proceed to review the district court's application of those standards.

V.

A.  **Subornation of Perjury and Selection of Alibi Defense**

Moore claims that trial counsel Bonner created a false alibi defense, and then suborned perjury by pressuring Moore and his sisters Clara Jean Baker and Colleen McNiese to testify in support of the alibi. Moore claims that Bonner engaged in this conduct notwithstanding Bonner's knowledge that Moore's confession accurately portrayed the shooting as accidental, rather than intentional. Moore identifies this conduct as deficient performance within the meaning of *Strickland*.

Moore supported his habeas claim in the state habeas

evidentiary hearing with his own testimony, and that of his sisters, to the effect that Bonner told them on the day of trial that alibi was the only possible means of avoiding the death penalty. McNiese testified that she did not understand what Bonner was asking her to do. Baker testified that she understood, and that she testified falsely at Moore's criminal trial shortly after talking to Bonner because she thought she was saving her brother's life.

The state habeas court heard conflicting evidence from Bonner that the alibi defense was insisted upon by Moore and corroborated by his family. Bonner also testified that he was skeptical of the alibi defense at first because most of his clients initially protested innocence, but that he became increasingly more comfortable with using the defense when he determined in the course of his pretrial investigation that none of the state's witnesses had been able to identify Moore, that Moore no longer lived with Betty Nolan, that Nolan's son, Michael Pittman, had a record, that the shotgun recovered from Nolan's house could not be definitively linked to either Moore or the offense, and that the state was not able to connect either of the wigs found at the crime scene to Moore using exemplar hair samples.

The state habeas court resolved this conflicting evidence with a credibility determination. The state court found that Bonner's testimony on the issue of subornation was credible, and that Bonner did not suborn perjury or attempt to suborn perjury from Moore's

40

sisters. Implicit in that fact finding is the additional determination that Bonner likewise did not suborn perjury from Moore.

The district court found deficient performance based upon counsel's presentation of a perjured alibi defense. The district court identified the state habeas court's factual determination that Bonner did not suborn perjury, but stated that the fact finding was not entitled deference because the state habeas court's finding was "confounded by overwhelming evidence to the contrary and is not supported by the record." The district court also found that the "conduct of trial counsel was so contrary to the great weight of evidence that only a foolish man would insist upon presenting such a defense." Both rationales for rejecting the state habeas court's factual determination are problematic.

With regard to the first rationale, we note that the state court's factual finding that Bonner did not suborn or attempt to suborn perjury is a credibility determination made on the basis of conflicting evidence that is virtually unreviewable by the district court or our Court. *Marshall*, 103 S. Ct. at 850. Section 2254(d) does not grant federal habeas courts a "license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court." *Id*. at 851. Moreover, even though we may share the district court's skepticism, the state habeas court's credibility determination draws fair support from the record in the

form of Moore's trial testimony and Bonner's evidentiary hearing testimony. For that reason, the district court's first rationale for rejecting the state habeas court's credibility determination and its contrary fact finding must be rejected as clearly erroneous. *See Bryant*, 28 F.3d at 1414 n.3.

The district court's second rationale is more subtle, but is apparently driven by the underlying premise that a reasonably competent attorney would have dissuaded Moore from pursuing an alibi defense. The district court opined that trial counsel cannot be permitted to evade their burden to provide reasonably effective assistance under the constitution by shifting the blame for selection of an implausible defense to the defendant.

Although we find ourselves somewhat in sympathy with the district court's comments, we cannot agree. Moore is presumed to be the master of his own defense. *See Faretta v. California*, 95 S. Ct. 2525, 2533-34 (1975); *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990); *Mulligan v. Kemp*, 771 F.2d 1436, 1441-42 (11th Cir. 1985). Were it otherwise, we might well face ineffective assistance of counsel challenges anytime a chosen defense failed. Moreover, Moore bears the burden of proving his allegation that the alibi defense was unwillingly foisted upon him. *See Brewer v. Aiken*, 935 F.2d 850, 860 (7th Cir. 1991) ("[W]e refuse to hold that the presentation of perjured testimony at the request of the defendant is adequate to constitute ineffective assistance of

counsel."). The state habeas court found that Moore maintained his innocence and endorsed the alibi defense at trial. That determination is fairly supported by Moore's trial testimony and Bonner's evidentiary hearing testimony. In addition to the evidence described above, the state tendered excerpts from Moore's pro se brief on direct appeal into the record of the state court habeas proceeding. Moore's pro se brief argues at length that trial counsel were ineffective for failing to call additional witnesses, including his grandmother and father, who would have testified in support of his alibi defense. When asked about this argument during the evidentiary hearing in the state habeas court, Moore conceded that he thought the argument should be raised. There is every indication, as the state habeas court found, that Moore maintained his innocence and insisted upon an alibi defense, both during his trial and on direct appeal.

Neither can we accept Moore's contention that counsel's decision to pursue an alibi defense was unreasonable as a matter of law, without regard to who selected the defense, because it was at odds with the known facts. We have already held that Moore chose the alibi defense. Counsel will rarely be ineffective for merely failing to successfully persuade an insistent defendant to abandon an unlikely defense. *See* **Mulligan**, 771 F.2d at 1442. Moreover, we cannot say that the alibi defense was necessarily at odds with the evidence known to counsel at the time Moore's trial began. None of

the state's witnesses had been able to identify Moore. In addition, Moore's physical appearance did not match eye-witness accounts of a taller man from Edna Scott. Neither the gun nor the wigs nor the plastic bags could be tied to Moore by way of fingerprints or exemplar hairs. The gun itself could not be definitively tied to the offense. Moreover, Michael Pittman had a significant prior record and was arguably as likely a suspect as Moore.

Moore counters that the alibi defense became untenable and should have been abandoned once his confession was ruled admissible. The district court agreed. We agree that succeeding on an alibi defense, particularly in the face of a defendant's admissible confession is "similar to one trying to climb by himself the tallest mountain in the world." *Moore*, 700 S.W.2d at 205. But there is no obvious conflict in the record evidence. Moore testified at trial before the jury that he did not sign the confession. Moore testified at trial before the jury in support of the alibi defense. Moore, acting pro se, pursued the alibi defense on direct appeal. Whatever inherent inconsistency was created by the admission of Moore's confession was cured by his testimony that the confession was invalid and his contemporaneous testimony that he was somewhere else when the crime was committed.

For the foregoing reasons, we decline to find deficient performance on the basis of Moore's allegation that counsel

suborned or attempted to suborn perjury in their presentation of the false alibi defense or that counsel should have persuaded Moore to abandon the alibi defense.

## B. Inadequate Pretrial Investigation

Moore also maintains that counsel's decision to pursue an alibi defense was unreasonable because counsel failed to conduct an adequate pretrial investigation into the controlling law and facts.

Moore contends that counsel's factual investigation of Moore's alibi defense was insufficient. This argument is divided into two separate components. First, Moore maintains that counsel should have determined that the support for Moore's alibi, that he was with his grandmother in Louisiana, was weak. Second, Moore argues that counsel were ineffective for failing to contact or interview or otherwise discern the testimony of state's witnesses to extraneous conduct committed by Moore.

With regard to the first argument, the state habeas court concluded that counsel conducted a reasonable and independent pretrial investigation. This conclusion of law rested upon factual determinations that counsel discussed the alibi defense with Moore and with Moore's family members, and that Moore's family supported the defense. The district court accepted the premise that counsel met with Moore and his family, but rejected the conclusion of law that counsel's pretrial investigation was therefore independent or reasonable. We review that determination of law de novo.

45

Moore's argument that counsel failed to conduct a sufficient investigation into the facts underlying his alibi defense is unavailing.  As an initial matter, Moore's ability to meet his burden on this point is substantially weakened by our conclusion that Moore himself chose and insisted upon the alibi defense. Moore is essentially arguing that counsel should have expended pretrial resources unearthing evidence to contradict their client's chosen defense.  We are persuaded that the record adequately supports the proposition that there was sufficient investigation, at least as to the veracity of Moore's alibi that he was in Louisiana when the offense occurred.  Moore selected the defense. Bonner interviewed Moore and Moore's family members.  Bonner traveled to Louisiana to interview Moore's grandmother.  In addition, Bonner reviewed the state's files, ascertaining that the physical evidence, and the testimonial evidence to be offered in the state's case-in-chief were consistent with Moore's alibi.  To the extent that the confession was inconsistent with the alibi defense, Moore's trial testimony that the confession was invalid cured any problem.  We therefore decline to find deficient performance on the theory that counsel failed to adequately develop facts contradicting the alibi defense.

Moore's second argument is that counsel were ineffective for failing to ascertain what evidence of similar extraneous conduct the state might offer in rebuttal to his alibi defense.  In contrast to its case-in-chief, the state introduced substantial and

highly probative evidence that Moore, carrying a shotgun, robbed two small grocery stores on the two Fridays preceding the Friday, April 25, 1980, robbery of the Birdsall Super Market. All of the state's three rebuttal witnesses were able to positively identify Moore. There can be no doubt that this evidence was critical to Moore's conviction. Prior to the state's case on rebuttal, none of the state's witnesses had been able to unconditionally place Moore at the scene of the crime. Moreover, it is undisputed that this damaging evidence was admissible only because Moore chose the alibi defense.

Moore argues that counsel acted unreasonably because they simply did not understand that Texas law would permit the state to rebut Moore's alibi with evidence of similar extraneous conduct. The state habeas court did not make any explicit findings of fact with regard to this issue. The state habeas court did find, however, that counsel made reasonable attempts to investigate potentially admissible extraneous conduct. Thus, the state habeas court implicitly found that counsel were aware of the controlling principles of Texas law that made extraneous conduct admissible to rebut a defendant's alibi defense. That finding is consistent with Bonner's state habeas hearing testimony that he knew extraneous conduct might come in and that he informed Moore of that possibility. The district court did not expressly address this implicit finding, but did conclude that counsel were unprepared to meet extraneous offenses that came in as a result of alibi.

47

Moore supports this argument with citations to counsel's trial objections. In those objections, counsel maintained that the extraneous conduct was inadmissible because not sufficiently proven. Counsel reasserted those arguments, with considerable persuasive force, on direct appeal. *Moore*, 700 S.W.2d at 198-201. Indeed, the Texas Court of Criminal Appeals wrote at length about both the general rule that extraneous conduct may be admissible to rebut an alibi defense and the exceptions to that general rule, as applied to Moore's case. *Id*. Viewed in the context of the entire trial record and the controlling principles of Texas law, we cannot say that counsel's trial objections demonstrate that counsel was not aware that extraneous conduct might be offered on rebuttal. We therefore conclude that the state habeas court's fact finding that Bonner was aware of the applicable principles of law is fairly supported by the record, and therefore entitled to deference from this Court.

Moore next argues that counsel had an affirmative duty to identify the state's witnesses to extraneous conduct and to interview those witnesses if possible. *See Bryant*, 28 F.3d at 1415 (finding ineffective assistance of counsel based upon counsel's failure to interview potential witnesses); *see also Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982) (noting that an ineffective assistance of counsel claim may be based upon counsel's failure to interview critical witnesses). Bonner conceded in the state habeas

hearing that the state's file included a list of witnesses slated to testify that Moore had participated in similar extraneous offenses. Notwithstanding that knowledge, Bonner admitted that he made no attempt to contact those witnesses or to ascertain the content of their potential testimony. *See **Bryant***, 28 F.3d at 1417 (counsel's failure to contact potential witnesses was uninformed by any investigation and was therefore not a strategic choice entitled to deference under ***Strickland***).

Bonner testified that he did not know whether Devine had contacted the extraneous witnesses. The state habeas court found, on the force of Bonner's testimony, that Devine interviewed the extraneous witnesses. The district court did not address this factual determination, aside from noting that counsel's pretrial investigation into extraneous conduct was inadequate in light of the chosen alibi defense.

We agree. Bonner's testimony is not probative with respect to whether Devine contacted the extraneous witnesses. Bonner said he did not know. He later qualified that testimony by stating that Devine might have handled that part of the case, but that assertion is contradicted by the fact that Bonner conducted the cross-examination of one of the state's star rebuttal witnesses. Moreover, counsel's trial objections and their pathetically weak cross-examinations of the state's rebuttal witnesses undermine beyond any reasonable doubt the proposition that counsel followed

49

up on information in the state's file by attempting to interview the state's witnesses to extraneous conduct or by independently investigating the damaging allegation that Moore was involved in two very similar robberies on the two Fridays preceding the Birdsall Super Market robbery. In counsel's own words: "We haven't had a chance to prepare a defense about things that have occurred at other places. We don't even know what is going on here." For the foregoing reasons, the state habeas court's fact finding that Devine contacted the state's witnesses to extraneous conduct is not fairly supported by the record, and is therefore not entitled to deference under § 2254(d).

Moreover, and without regard to whether Devine actually contacted the state's witnesses to extraneous conduct, the record quite plainly establishes that counsel failed to include any consideration of the state's evidence of extraneous conduct when counseling Moore about the alibi defense. Thus, even if the investigation was adequate, counsel's response to the admissible evidence was so unreasonable as to fall well outside the bounds of reasonable professional performance. For the foregoing reasons, we find deficient performance on the basis that counsel failed to

investigate the substance of evidence to be introduced on rebuttal in response to Moore's alibi defense, or proceeded unreasonably in light of that evidence.[5]

## C. Exclusion of Exculpatory Language in Moore's Confession

Moore contends that his counsel provided constitutionally deficient performance in their handling of his confession during the guilt phase of trial. Moore's confession contained the following exculpatory language:

> The old man in the booth leaned over to open a drawer in the booth. I started trying to push him back with the barrel of the shotgun. I was leaning over the counter of the booth and I suddenly fell backwards and the butt of the gun hit my arm and the gun went off. I didn't learn until later that the man had been shot. I seen it on T.V. The man must have been standing back up as I fell backwards and the gun went off.
>
> * * *
>
> I swear I was not trying to kill the old man and the whole thing was an accident.

---

[5] Moore also argues that counsel were deficient for failing to interview Moore's fellow perpetrators, Koonce and Pradia, for the purpose of determining what evidence those individuals might have offered against Moore. Bonner testified that he attempted to contact Koonce and Pradia, but that the contact was forbidden by their lawyers. The state habeas court also reviewed conflicting affidavit testimony from Koonce's lawyers that neither Bonner nor Devine ever contacted them. The state court resolved this conflict in the evidence by finding that Bonner attempted to contact Koonce and Pradia, but was precluded from interviewing them by their counsel. While Bonner's testimony is frankly incredible on this point, the state habeas court's fact finding finds some support in the record. We are therefore precluded from substituting our own judgment for that of the state habeas court, which received Bonner's live testimony. For that reason, we find no deficiency in counsel's performance on the theory that they failed to contact Koonce and Pradia.

No one disputes that the exculpatory language quoted above has obvious relevance to the guilt phase issue of intent, as well as the punishment phase special issue of deliberateness.

Moore's confession was introduced through one of the arresting officers, Officer Ott. Officer Ott testified on voir dire that *all* of the statements in Moore's confession were Moore's own statements. The state nonetheless wanted to limit its tender to those portions of the confession that were inculpatory. Moore's counsel initially stated that they had not decided whether they would use the remaining exculpatory portions. After the state agreed to temporarily cover the exculpatory language, Moore's counsel inexplicably agreed not to use the exculpatory language and requested that the portions quoted above be excised from his confession. As a result, the jury received a confession that describes Moore pointing a shotgun in McCarble's direction, sets forth a conspicuous white space where the crime should have been described, and then describes Moore fleeing the store after McCarble was shot. Moore's counsel did not attack the veracity or completeness of the confession by cross-examining Officer Ott and did not offer the excluded exculpatory language at any later stage of Moore's trial.

Bonner was asked why the exculpatory language was excised from the confession during the state habeas evidentiary hearing. He testified as follows:

52

> Well, maybe it was taken out by the state. I don't
> know who took it out, really. It doesn't have my
> signature down there that I actually took it out.
> Maybe the Court took it out prior to even having it
> introduced. I don't suggest to you that I did
> that.

When recalled by the state, Bonner testified there "may have been" statements in the confession that were inconsistent with the chosen strategy of alibi. When prodded further, he stated that Moore's statements that the shooting was accidental might fall into that category.

Bonner was also asked why the exculpatory language, which supported Devine's jury argument during the punishment phase, would not have been introduced during the punishment phase of the trial. Bonner testified "I don't know." Bonner further testified that the exculpatory portions of Moore's confession: (1) could have been introduced at the punishment phase, (2) would have been relevant in the punishment stage, and (3) given the jury's guilty verdict, would not in this case have been inconsistent with the chosen theory of alibi at the punishment phase. Based upon this evidence, the state habeas court found that counsel's decision to excise exculpatory portions of the confession was "consistent with" the alibi defense. The state habeas court also concluded that counsel's use of the alibi defense rendered any use of the exculpatory language "illogical." Thus, the state court implicitly concluded that counsel made a reasonable strategic decision that Moore's exculpatory statements were inconsistent with his chosen

theory of alibi. The Director argues that this Court is bound by that mixed finding of fact and conclusion of law.

The district court cited record evidence supporting Moore's claim that the shooting was accidental, including the location of the wound, and testimony that Moore and the people in the booth moved suddenly just before the shot was fired. The district court noted that such evidence was consistent with Moore's confession, which stated that he was trying to push McCarble back from a drawer in the booth when he suddenly fell back. The district court reviewed and rejected the state court's legal conclusion that counsel's decision to exclude the exculpatory language was reasonable, holding that counsel's failure to introduce this potentially mitigating evidence was unconscionable to the point that it transcended even the rigorous standard for ineffective lawyering.

To the extent that the state habeas court made an implicit fact finding that counsel made a strategic decision to exclude exculpatory portions of the confession, we reject that finding as not fairly supported by the record. Bonner testified that he had no idea why the exculpatory language was excluded, or even who had requested that the exculpatory language be excluded. There is, therefore, no support, let alone fair support, for such a fact finding.

To the extent that the state habeas court entered a legal conclusion that counsel's decision to exclude exculpatory portions

54

of Moore's confession was professionally reasonable, we likewise reject that determination and affirm the district court. Both the state habeas court's findings and the Director's arguments on appeal defend counsel's decision with the statement that it was "consistent with" the chosen trial strategy of alibi. But it was Moore's confession, rather than the exculpatory language contained therein, that was fatally inconsistent with the alibi defense. Surely the inculpatory portions of the confession, which placed Moore at the scene of the crime with a firearm pointed at McCarble, were as inconsistent with Moore's alibi defense as those exculpatory portions excluded by counsel. Once the confession was deemed admissible, there was no justification and no potential benefit to the defense to be obtained from excluding the exculpatory language. The jury could only accept or reject the confession. The inclusion of exculpatory language concerning a plausible alternative defensive theory that was supported by some evidence, and that could have raised a reasonable doubt in the jury's mind, could in no way have further imperiled Moore's defense.

Moreover, the criminal law does not preclude alternative, or even inconsistent, defensive theories. Indeed, the most successful criminal attorneys are often those who can create a reasonable doubt in the jurors' minds by throwing up one or two or more plausible alternatives to the defendant's guilt. Individual jurors need not be persuaded by the same plausible alternative to guilt to

55

vote an acquittal.  Thus, the premise underlying the state habeas court's conclusion and the Director's arguments on appeal that Moore's own choice of the alibi defense required the exclusion of the exculpatory language is simply wrong as a matter of law. Counsel's decision to exclude that language, which produced no conceivable benefit to the defense and prejudiced Moore by precluding reliance upon a plausible alternative defensive theory that was supported by other evidence in the record, was professionally unreasonable.  *See* **Whitley**, 977 F.2d at 158-59 & nn. 21-22; **Profitt**, 831 F.2d at 1249; **Lyons v. McCotter**, 770 F.2d 529, 534-35 (5th Cir. 1985) (**Strickland** does not require deference when there is no conceivable strategic purpose that would explain counsel's conduct).

For the forgoing reasons, we find that Moore's trial counsel provided constitutionally deficient performance with respect to their handling of Moore's confession during the guilt phase of Moore's trial.[6]

## D.    Damaging Cross-Examination of Officer Autrey

Moore maintains that trial counsel Devine provided deficient performance by eliciting damaging evidence against Moore during his cross-examination of the state's first witness, arresting officer

---

[6]  We also find counsel's failure to tender Moore's complete and unredacted confession during the punishment phase of Moore's trial to be a component of counsel's deficient performance.  That holding is discussed in section V.E. below.

Autrey.

The state called arresting officer Autrey to identify pictures taken at the crime scene and to place the crime in context. The state's direct examination is brief and takes up only eleven pages of the transcript. Trial counsel Devine's extensive cross-examination of Autrey went far beyond the scope of direct, providing either the first mention or the only evidence of the following important facts: (1) that size 8 shotgun pellets were found on the floor of the courtesy booth; (2) that police recovered plastic bags from the scene of the crime, including one containing a wig and one containing a receipt traced to Moore's "play mama" Betty Nolan; (3) hearsay testimony that the bag containing Nolan's receipt was dropped during the offense, and not at some other time; (4) hearsay testimony that Moore came to Nolan's house on April 25, 1980, the day of the offense, and stayed there that night; (5) that police recovered a shotgun from under Moore's bed at Nolan's house; (6) that the shotgun recovered from under Moore's bed was found with one expended shell and one shell containing size 8 shot, the same size shot used in the offense; (7) hearsay testimony that witnesses to the offense heard only one shot; and (8) that police received a telephone call from a citizen named White, who informed police that Moore was at his grandmother's house in Louisiana, and that police subsequently arrested Moore there. Devine also elicited testimony that was not otherwise offered by the state through Autrey concerning the accuracy of the police investigation,

57

including: (1) testimony that a store customer took down the robbers' license plate number; (2) testimony that Koonce was arrested in a car identified by the customer's information; (3) testimony that Koonce gave a confession; and (4) other testimony about the apprehension and arrest of Koonce and Pradia. This damaging testimony tied Moore to the crime and supported the accuracy and credibility of the police investigation. All of this very damaging evidence was elicited by Moore's own trial counsel from the state's first witness.

Devine died shortly after trial and long before the 1993 state evidentiary hearing. Although the issue was presented to the state habeas court, Bonner did not advance any explanation for the damaging cross-examination during the state habeas hearing. Indeed, the issue did not receive any significant development during the hearing and, aside from denying relief as to the entire petition, the state habeas court did not enter any potentially binding findings of fact with respect to this issue. The district court found deficient performance, concluding that counsel's cross-examination of the state's first witness obliterated Moore's alibi defense, long before Moore's confession was deemed admissible. We review the factual component of that holding for clear error and the legal component of that holding de novo. *Bryant*, 28 F.3d at 1414 & n.3.

We find no error in the district court's holding. Devine's

cross-examination of Autrey elicited some of the most damaging testimony against Moore. None of that testimony was elicited by the state on direct examination. Some of that testimony was never repeated by any other state witness, and no witness provided such a detailed and chronological account of Moore's guilt. The district court's factual determination that Devine's cross-examination of the state's first witness effectively destroyed Moore's alibi defense, long before the state offered such probative evidence and long before Moore's confession was deemed admissible, is not clearly erroneous. Moreover, neither the record nor common sense supports the proposition that Devine's approach to Autrey's testimony was motivated by any strategic purpose that could conceivably have yielded any benefit to the defense. *See* **Whitley**, 977 F.2d at 158-59 & nn. 21-22; **Profitt**, 831 F.2d at 1249; **Lyons**, 770 F.2d at 534-35. To the contrary, Devine's cross-examination of Autrey does nothing but set forth, from the mouth of Moore's own trial counsel, the state's best case against Moore. While perhaps not sufficient standing alone to support conviction, the evidence thus elicited would have contributed significantly to a guilty verdict, even if Moore's confession had been later deemed inadmissible. For the foregoing reasons, we affirm the district court's conclusion that Devine's ineffective cross-examination of Autrey constitutes deficient performance as defined in **Strickland**.

**E.  Failure to Investigate, Develop, or Present Mitigating Evidence**

Moore claims that trial counsel were ineffective for failing to investigate, develop, or present available and availing mitigating evidence during the punishment phase of his trial. Moore's claim encompasses counsel's: (1) failure to investigate and failure to present any mitigating background evidence, despite knowledge that should have given rise to such a duty; (2) failure to present previously redacted and exculpatory evidence that the shooting was accidental, despite counsel's abandonment of the alibi defense during closing argument at the guilt phase, and despite counsel's decision to argue accidental shooting as a plausible alternative defensive theory at the punishment phase of Moore's trial; and (3) counsel's insufficient, internally inconsistent, and incompetent argument at the punishment phase of Moore's trial.

Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in a given case. *See* **Woodson v. North Carolina**, 96 S. Ct. 2978, 2991 (1976); *see also* **Eddings v. Oklahoma**, 102 S. Ct. 869, 875 (1982). At the state court evidentiary hearing, Moore presented substantial evidence that could have been offered as mitigating evidence during the punishment phase of his trial. Moore produced substantial evidence from several sources that his childhood was marked by physical and

emotional deprivation and abuse. *See* **Penry v. Lynaugh**, 109 S. Ct. 2934, 2947 (1989) (quoting **California v. Brown**, 107 S. Ct. 837, 841 (1987) (O'Connor, J. concurring) for proposition that "evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"); *id*. at 2948-52 (discussing the significance that mitigating evidence of childhood abuse and mental retardation have with respect to the individualized sentencing determination required by the Eighth Amendment for imposition of the death penalty);[7] **Eddings**, 102 S. Ct. at 877 ("evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant" to an individualized sentencing determination). Specifically, Moore offered evidence from several sources that his father, Ernest Moore, Jr., was an abusive alcoholic who was often absent and rarely provided his family with financial support, even when present. The evidence further established that Ernest Moore, Jr. routinely beat his children with his hands, and with whatever other

---

[7] Moore and the defendant in Penry were tried three months apart. Both were tried under Texas laws that the Supreme Court declared in **Penry** failed to allow a "reasoned moral response" to mitigating evidence offered during the penalty phase of a capital trial as required by the Eighth and Fourteenth Amendments. **Penry**, 109 S. Ct. at 2952.

61

household effects or furniture happened to be close at hand. The evidence established that Ernest Moore, Jr. targeted petitioner Moore more often than Moore's other siblings because Moore attempted to intervene in physical altercations between his parents to protect his mother. Moore's mother was likewise an absent parent, being forced to hold down two jobs to support Moore and his brothers and sisters. After one particularly violent altercation, Moore was forced to leave the house for good when he was fourteen years of age. After that, family members sometimes defied the father by permitting Moore to slip into the house late at night or by sneaking him food, but Moore largely survived by sleeping on the street and stealing food to survive.

Moore's school records corroborate the neglect, deprivation, and physical abuse that characterized Moore's early childhood. School records describe a morose and withdrawn child who rarely participated in classroom activities. School records likewise describe Moore as suffering from severe developmental delays, perhaps resulting from poor nutrition and inadequate parenting. Moore never passed any year and was granted only social promotions until he dropped out altogether shortly after he was kicked out of the house at age fourteen.

Moore also produced substantial evidence of impaired mental development and functioning, and some evidence of organic brain damage resulting from severe trauma. See *Zant v. Stephens*, 103

S. Ct. 2733, 2747 (1983) (mental illness militates in favor of a lesser penalty); *Whitley*, 977 F.2d at 157 (granting relief where counsel failed to develop independent evidence of mental disease or defect). Moore offered the testimony of Dr. Robert Borda, who holds a Ph.D. in psychology and a Ph.D. in physiology. Borda reviewed Moore's school records, as well as psychological testing performed when Moore was in school, and psychological testing conducted while Moore was incarcerated for this offense in 1989. Both sets of tests indicate that Moore's intelligence is in the borderline retarded range. Borda testified that Moore's performance on other tests, such as the Bender-Gestalt, indicate that Moore's ability to perform in an uncontrolled environment is actually lower than indicated by his borderline IQ, and would very likely fall squarely within the retarded range. Borda also testified that the psychological testing performed when Moore was in school suggested that Moore suffered a severe trauma to the head or brain. Borda testified that such an injury would have impaired Moore's ability to function beyond the limitations reflected in the intelligence testing alone. Based upon the materials reviewed, Dr. Borda testified that Moore's mental age at the time of the offense was estimated to be fourteen, as compared to his still relatively youthful biological age of nineteen. In addition to the school records and psychological testing described, Moore also offered evidence that the Texas Rehabilitation Commission conducted a

63

psychological evaluation on Moore when he was released from prison in 1979. Although the records of that psychological evaluation were destroyed in 1984, they would have been available for counsel's review at the time of Moore's 1980 capital trial.

Moore also maintained in the state evidentiary hearing that counsel could have relied upon his prison record and early release, as evidence tending to negate the state's burden on the future dangerousness issue. *Skipper v. South Carolina*, 106 S. Ct. 1669 (1986) (evidence that a prisoner would not pose a future danger in the prison community if spared the death penalty and imprisoned for life must be considered potentially mitigating in a capital case). The penitentiary package introduced by the state demonstrated that Moore was first arrested three years after he left home, at age seventeen. Moore was convicted and sentenced to eight years. Moore was nonetheless released after only two years. The state was permitted to interpret Moore's record for the jury, and relied upon that interpretation in closing argument. Specifically, the state noted that Moore had four separate convictions, and argued that Moore's prior record demonstrated a pattern that required an affirmative finding on the special issue of future dangerousness. As noted above, Moore's counsel did not respond with their own interpretation of the penitentiary package. Neither did counsel clarify that Moore was sentenced for each of the four offenses on the same day, that Moore began serving his sentence for each of the

64

four convictions on the same day, or that Moore was released from serving the balance of the four concurrently imposed sentences after only two years. In fact, Moore's counsel simply stipulated that the documents comprising the penitentiary package, and by inference the state's interpretation of those documents, was correct.

In the state hearing, Bonner admitted that he was aware of some aspects of Moore's troubled childhood. Bonner conceded that, despite this knowledge, he did not conduct any investigation for the purpose of developing mitigating evidence. Bonner justified this failure to investigate with his view that mitigating evidence of a troubled family background or impaired mental functioning is per se inconsistent with an alibi defense. Bonner also suggested that this was a "guilt/innocence" case rather than a "punishment" case. Somewhat inconsistently, Bonner also testified that there was no reason not to offer the previously redacted and exculpatory portions of Moore's confession once the jury had rejected Moore's alibi defense with the guilty verdict. Indeed, Bonner testified that the jury's rejection of Moore's alibi defense made the exculpatory portions of Moore's unredacted confession admissible and relevant on the issue of punishment. Based upon this evidence, the state habeas court found that counsel made a strategic decision not to present mitigating background evidence at the punishment phase of Moore's trial. The state habeas court did not make any fact finding with respect to counsel's failure to offer Moore's

65

unredacted confession during the punishment phase of the trial.

The district court considered and rejected the state court's fact finding that trial counsel made an informed strategic decision not to present mitigating evidence. The district court noted that counsel's purported decision was neither informed by an adequate investigation nor undergirded by any logical strategic purpose. For the reasons that follow, we affirm the district court.

Notwithstanding the constitutional stature of appropriate mitigating evidence in a capital case, counsel's failure to develop or present mitigating background evidence is not per se deficient performance. *See* **Ransom v. Johnson**, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 118 S. Ct. 361 (1997); **West**, 92 F.3d at 1408; **King v. Puckett**, 1 F.3d 280, 284 (5th Cir. 1993). To the contrary, a considered strategic or tactical decision not to present mitigating evidence that is made after a thorough investigation of the law and facts relevant to all plausible lines of defense is presumed to be within the wide range of professionally reasonable assistance defined by **Strickland**. **Strickland**, 104 S. Ct. at 2066; **Whitley**, 977 F.2d at 158; **Drew v. Collins**, 964 F.2d 411, 422 (5th Cir. 1992); **Wilkerson v. Collins**, 950 F.2d 1054, 1065 (5th Cir. 1992); **McCoy v. Lynaugh**, 874 F.2d 954, 964 (5th Cir. 1989) (counsel's decision not to present mitigating evidence is entitled to deference when based upon an informed and reasoned practical judgment). Stated differently, **Strickland** requires that we defer

66

to counsel's decision not to present mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense. *Strickland* does not, however, require deference to decisions that are not informed by an adequate investigation into the controlling facts and law. *Whitley*, 977 F.2d at 157-58; *see also* *Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir. 1994) (counsel's strategic decision entitled to deference because supported by an adequate investigation which included contact with at least 27 people); *Whitley*, 977 F.2d at 157 (counsel's failure to pursue crucial line of defense held to be professionally unreasonable); *Drew,* 964 F.2d at 423 (counsel's strategic decision entitled to deference because counsel made "reasonable inquiries" into Drew's mental state); *Wilkerson,* 950 F.2d at 1064-65 (affording strategic decision deference where record established the counsel retained an investigator to explore whether mitigating evidence relating to defendant's background or mental ability was available); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *McCoy*, 874 F.2d at 964 (finding scope of investigation reasonable where counsel investigated possibility of mitigating evidence by interviewing everyone on a list provided by the capital

67

defendant and determined none of them had anything good to say about the defendant); *Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir. 1986) ("counsel either neglected or ignored critical matters of mitigation"). Similarly, *Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose. *See Strickland*, 104 S. Ct. at 2061 ("Counsel may not exclude certain lines of defense for other than strategic reasons."); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) (explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant), *cert. denied*, 117 S. Ct. 968 (1997); *Whitley*, 977 F.2d at 158 ("Whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny. The crucial distinction between strategic judgment calls and just plain omissions has echoed in the judgments of this court.") (footnote omitted); *Profitt*, 831 F.2d at 1249 (*Strickland* does not require deference to decisions which do not yield any conceivable benefit to the defense); *Bell v. Lynaugh*, 828 F.2d 1085, 1090 (5th Cir. 1987) (when counsel makes an informed and considered decision not to present mitigating evidence, the issue becomes whether the decision was reasonable ); *Wilson*, 813 F.2d at 672 (remanding for evidentiary hearing because record did not reflect whether counsel made a sound strategic decision not to present mitigating evidence of troubled background and mental

impairment); *Lyons*, 770 F.2d at 534-35 (finding deficient performance because there was no sound strategic basis for counsel's failure to object to evidence of prior offenses); *Mattheson*, 751 F.2d at 1439-40 (explaining strategic purpose motivating counsel's decision to exclude evidence of mental impairment from sentencing phase); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir. 1984) (explaining basis of counsel's considered decision to limit investigation by excluding implausible lines of mitigating evidence).[8]

Moore maintains that counsel's failure to present mitigating evidence is not entitled to a presumption of reasonableness because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Moore's defense. We agree. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 104 S. Ct. at 2066; *Mattheson*, 751 F.2d at 1439-40; *Bell*, 828 F.2d at 1088. Counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). But strategic decisions made

---

[8] We are dealing, in this case, with the deference required to counsel's decisions. Obviously, a competent defendant may, as master of his or her own defense, elect to forgo the presentation of mitigating evidence. *See*, *e.g.*, *Lowenfield v. Phelps*, 817 F.2d 285, 290 (5th Cir. 1987), *aff'd,* 108 S. Ct. 546 (1988); *Mattheson*, 751 F.2d at 1439-40; *see also Strickland*, 104 S. Ct. at 2066.

without an adequate investigation into the facts and law controlling plausible defensive theories are reasonable only to the extent that reasonable professional judgment supports counsel's limitation on the investigation. *Strickland*, 104 S. Ct. at 2066; *Ransom*, 126 F.3d at 723; *Whitley*, 977 F.2d at 157-58; *Bouchillon*, 907 F.2d at 597; *Bell*, 828 F.2d at 1088. With those principles in mind, we note at the outset that this is not a case in which counsel had no notice and no reason to suspect that a background investigation would produce potentially valuable mitigating evidence. *Compare Bouchillon*, 907 F.2d at 597-98 (counsel's failure to investigate despite knowledge that further investigation might be fruitful constituted deficient performance), *with Ransom*, 126 F.3d at 723; *West*, 92 F.3d at 1408; *Andrews*, 21 F.3d at 623-24 (failure to investigate not deficient performance where counsel had no reason to believe that further investigation might be fruitful). Bonner testified that he was aware of Moore's troubled background at trial. That awareness, which included knowledge that Moore's family was physically abusive, should have triggered some sort of inquiry into Moore's background. *See Motley*, 18 F.3d at 1228 (counsel's awareness of and decision to present evidence of child abuse while failing to investigate "neurological damage and other evidence that would have been in the same vein" as the child abuse evidence actually presented may have been unreasonable). Moreover, this is not a case in which counsel made some limited inquiry, and

70

the defendant is alleging that counsel should have focused upon additional areas of inquiry or unearthed some obscure or tangentially relevant evidence. *Compare* **Whitley**, 977 F.2d at 159 (granting relief based upon counsel's complete and total failure to investigate a critical issue), *and* **Jones**, 788 F.2d at 1103 (granting relief where counsel completely abdicated the responsibility to investigate the availability of mitigating evidence), *with* **Bell**, 828 F.2d at 1088 (denying relief where counsel conducted a thorough independent investigation into defendant's mental state because, notwithstanding the additional evidence offered by the defendant on collateral review, there was no evidence counsel neglected or ignored the defendant's mental state), *and* **Thompson v. Cain**, 161 F.3d 802, 813 (5th Cir. 1998) (rejecting petitioner's contention that counsel should have delved further into his mental state in case where sociologist testified regarding the petitioner's background and relationships). To the contrary, Bonner conceded in the state evidentiary hearing that he made no inquiry into Moore's background for the purpose of developing mitigating background evidence of any sort. Likewise, although Moore's confession made accidental shooting a plausible alternative defensive theory at both the guilt and punishment phases of Moore's trial, counsel never made any investigation intended to test that theory. To be clear, we are dealing here with counsel's complete, rather than partial, failure to

71

investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial. That fact distinguishes this case from those cases in which we have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense. *See, e.g.*, ***Darden v. Wainwright***, 106 S. Ct. 2464, 2474 (1986) (counsel's failure to present mitigating evidence relating to defendant's character, psychiatric evaluation and history as a family man did not constitute deficient performance where such evidence would have opened the door to otherwise excluded evidence that defendant had prior criminal convictions, was diagnosed as a sociopathic personality, and had in fact abandoned his family); ***Mattheson***, 751 F.2d at 1439-40 (counsel made reasonable strategic decision to omit presentation of mitigating evidence of mental impairment where such evidence would have opened door to known evidence that defendant was a violent sociopath). Given that counsel's conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, we find that there is no decision entitled to a presumption of reasonableness under ***Strickland***. Moreover, the record does not otherwise contain any justification for limiting, or in this case, completely omitting, any investigation into

72

Moore's background or the facts that might support counsel's accidental shooting argument during the punishment phase of the trial.[9]   We therefore find counsel's complete failure to investigate Moore's background and the facts underlying the accidental shooting theory argued during the punishment phase to be professionally unreasonable and deficient performance in the context of this case.

Of equal importance, we agree with the district court that counsel's decision not to present any mitigating evidence was not motivated or justified by any strategic or tactical rationale.  *See* *Whitley*, 977 F.2d at 158-59 & nn. 21-22; *Profitt*, 831 F.2d at 1249; *Lyons*, 770 F.2d at 534-35 (*Strickland* does not require deference when there is no conceivable strategic purpose that would explain counsel's conduct).  The state habeas court's fact finding, to the extent it is contrary, finds no support in the record and was properly rejected by the district court.  *See* 28 U.S.C. § 2254(d) (1994).

Bonner's only justification for completely failing to develop or offer available mitigating evidence was that mitigating evidence of any type or quantity is per se inconsistent with an alibi

---

[9]   The record does suggest that counsel were unprepared and did not expect to proceed to the punishment phase of Moore's trial immediately after the guilty verdict was returned late in the afternoon.  Rather than requesting a continuance, however, counsel agreed to proceed.  The evidentiary portion of the punishment phase was concluded only ten minutes later.

defense. Bonner's view is overbroad and insufficient alone, without any reference to why that justification would apply in this case, to justify counsel's complete failure to investigate for the purpose of making an informed decision and failure to offer any mitigating evidence. *See* **Stafford v. Saffle**, 34 F.3d 1557 (10th Cir. 1994) (finding deficient performance and rejecting argument that an alibi defense during the guilt phase is per se inconsistent with mitigating evidence relating to the defendant's personal background); **Brewer**, 935 F.2d 850 (granting relief on claim that counsel failed to offer mitigating evidence during the sentencing phase in case involving an alibi defense at the guilt phase).

On appeal, the Director tries to put the best face on Bonner's justification by arguing that counsel made a strategic decision not to present mitigating evidence based upon the possibility that the jury entertained a "residual doubt" about Moore's alibi defense. This Court has recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant. *See*, *e.g.*, **Andrews**, 21 F.3d at 623 n.21.

This is not a residual doubt case. Moore's alibi defense failed miserably. The testimony in support of that defense was internally inconsistent and failed for the most part to place Moore in Louisiana at the time the offense was committed. The state

74

responded with overwhelming evidence of Moore's involvement in similar extraneous offenses as well as narrowly tailored rebuttal evidence refuting Moore's alibi. In what was undoubtedly one of his most reasonable decisions as trial counsel, Bonner himself essentially abandoned the alibi defense during closing argument at the guilt phase by telling the jury that it did not matter whether Moore and his sister testified truthfully. The jury deliberated briefly, asking only for copies of Moore's "confessions," then rejected Moore's alibi defense by returning a verdict of guilty.

More importantly, Moore's counsel did not adhere to the alibi defense during the punishment phase of Moore's trial. Although Bonner challenged the quantum of the state's proof, neither Bonner nor Devine attempted to resurrect the defeated alibi defense. To the contrary, counsel Devine earnestly argued that the shooting was accidental. Thus, counsel made an entirely reasonable decision to pursue the accidental shooting theory as a plausible alternative to alibi during the punishment phase of Moore's trial. Given these facts, there was no logical or factual support for and no conceivable strategic purpose to be achieved by excluding the potentially mitigating background evidence identified by Moore.

Furthermore, there is more in this case than simply a general failure to conduct an investigation or to present mitigating evidence of the type traditionally found in capital cases. In this case, counsel also failed to make use of readily available evidence. Specifically, counsel failed to support their punishment

phase jury argument that the shooting was accidental with the best evidence of that theory, Moore's own statements that the shooting was accidental. Counsel also failed to capitalize on the opportunity to argue Moore's early release from prison as a factor mitigating against an affirmative response on the special issue of future dangerousness. Finally, the effect of counsel's deficient performance is not reduced by any guilt phase or punishment phase evidence that can be construed as potentially mitigating. *Compare Jones*, 788 F.2d at 1103 (finding ineffective assistance where counsel presented no mitigating evidence at all), *with Motley*, 18 F.3d at 1228 (refusing to find deficient performance where proposed mitigating evidence is cumulative of other testimony offered during guilt phase of capital trial). As with counsel's failure to investigate, we are dealing here with a complete, rather than partial, failure to offer any mitigating evidence on Moore's behalf. Our decision that counsel failed to make a strategic decision entitled to deference under *Strickland*, and that counsel's conduct was in this case professionally unreasonable, is heavily influenced by these additional omissions, for which neither the record nor common sense can provide any answer.

For the foregoing reasons, we affirm the district court's holding that counsel did not make an informed or strategic decision not to investigate, develop or present mitigating evidence that is entitled to deference under *Strickland*. We likewise affirm the

district court's holding that counsel's failure to investigate or offer available mitigating evidence was professionally unreasonable and constituted deficient performance within the meaning of *Strickland*.

## VI.

Finally, we come to the prejudice prong of the *Strickland* analysis. The Director argues that neither counsel's failure to investigate extraneous offenses admissible only because Moore chose the alibi defense, nor counsel's redaction of exculpatory statements in the otherwise admissible and otherwise inculpatory confession, nor counsel's obliteration of the alibi defense in their cross-examination of Officer Autrey is relevant to the district court's grant of relief, that is, a new punishment hearing. The Director's argument may be reduced to the premise that deficient performance occurring at the guilt phase of a capital trial may not be deemed to prejudice a capital defendant during the punishment phase of a capital trial. We reject this notion. When, as here, the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable. *See Strickland*, 104 S. Ct. at 2064 (relief is appropriate when "the conviction or death sentence resulted from

a breakdown in the adversary process that renders the result unreliable").

The district court declined to find prejudice at the guilt phase of the trial, a legal conclusion with which we agree. Like the district court, we too are concerned by the multiple lapses of trial counsel, and by the fact that much of the evidence against Moore came in as a result of counsel's pathetically weak presentation of the alibi defense or as a direct result of counsel's deficient performance. Nonetheless, we are unable to state that any particular deficiency in trial counsel's performance at the guilt phase, or even the cumulative effect of all deficiencies at the guilt phase, is sufficient to render the guilty verdict in Moore's case unreliable.

The district court reached a different result with respect to the punishment phase of Moore's trial, holding (1) that the aggregate effect of counsel's deficient performance resulted in a certain death sentence, and (2) that, absent counsel's deficient performance, the jury would likely have sentenced Moore to life imprisonment. On appeal, we must determine whether there is a reasonable probability that, but for counsel's deficient performance, the jury might have answered the special issues submitted in the punishment phase differently. *Whitley*, 977 F.2d at 159; *Duhamel v. Collins*, 955 F.2d 962, 965-66 (5th Cir. 1992); *Wilkerson*, 950 F.2d at 1065; *Profitt*, 831 F.2d at 1249. For the

reasons that follow, we conclude that such a reasonable probability exists.

We conclude that counsel's deficient performance, including counsel's performance during the guilt phase of Moore's trial, prejudiced the outcome of the punishment phase of Moore's trial. Counsel was deficient for failing to investigate and respond to information in the state's file about extraneous offenses that counsel knew would be admissible directly as a result of Moore's chosen alibi defense. As a result, counsel were completely unprepared to address the state's rebuttal evidence and completely unprepared to cross-examine the state's damaging rebuttal witnesses, who testified that Moore was involved in two similar robberies on the two Fridays preceding the April 25, 1980 robbery of the Birdsall Super Market. This damaging evidence, which was virtually untested by defense counsel, has obvious relevance to the punishment phase special issues of deliberateness and future dangerousness, and was offered by the state in argument as support for an affirmative finding on those issues. *See* **Bryant**, 28 F.3d at 1415 (finding ineffective assistance of counsel based upon counsel's failure to interview potential witnesses). Nonetheless, and notwithstanding counsels' decision to abandon the ill-fated alibi defense during the penalty phase of Moore's trial, counsel was completely unprepared to question or otherwise answer any aspect of this damaging evidence as it related to the jury's

deliberation of Moore's punishment. While counsels' deficiency in this regard is insufficient, standing alone, to support a finding of *Strickland* prejudice, counsels' failure to investigate by interviewing witnesses disclosed to counsel by the state and counsels' failure to proceed reasonably in light of that evidence once disclosed, when viewed in light of counsels' other failures, does play a supporting role in our determination that Moore was prejudiced during the penalty phase of his capital trial.

Counsel rendered deficient performance with respect to their handling of Moore's confession during the guilt phase of Moore's trial. Specifically, counsel made an illogical and irrational decision to exclude exculpatory language, permitting only the state's version of events to go to the jury. Counsel then made no objection when the state breached its pre-submission agreement not to rely upon the excluded portions of the confession, by arguing to the jury that the excluded portions supported the state's theory that the confession was valid. Counsel continued to stand by silently as the state misled the jury by stating, in the context of its discussion of the excluded portions of the confession, that there was no contention in the case that the shooting was accidental. Notwithstanding that conduct, counsel then switched tracks almost immediately thereafter by arguing to the jury during the punishment phase that the shooting was indeed accidental. Counsel's unreasonable decision to remove the accidental shooting

80

theory from the jury, coupled with their failure to object to the state's misleading argument, and their failure to offer the unredacted confession during the penalty phase, which would have impeached the state's argument that accidental shooting was not at issue and supported counsel's punishment phase argument, prejudiced Moore because it removed Moore's contention that the shooting was accidental from the jury's consideration. There is a reasonable probability that evidence supporting counsel's argument that the shooting was accidental, which was the only plausible defensive theory at the punishment phase, would have influenced the jury's deliberations on the issue of deliberateness. *See Whitley*, 977 F.2d at 158-60; *Jones*, 788 F.2d at 1103.

Counsel rendered deficient performance by eliciting damaging evidence far beyond the scope of direct examination in their cross examination of the state's first witness, Officer Autrey. Counsel's cross-examination of Autrey established many elements of the State's case-in-chief against Moore through the state's first witness. To the extent that some details were likewise elicited from another state witness, Officer Ott, they were likewise elicited by Moore's own counsel on cross-examination. Although Autrey's detailed and damaging testimony was primarily relevant on the issue of Moore's guilt, no other witness provided the same detailed account of the details of Moore's offense. We therefore conclude that the testimony elicited from Autrey by Moore's counsel

81

was also relevant to and probably contributed in some measure to the jury's determination of the punishment phase special issues of deliberateness and future dangerousness.

Finally, counsel rendered deficient performance by failing to investigate, develop, or present available mitigating evidence relating to Moore's background, Moore's contention that the shooting was accidental, and Moore's prison record during the punishment phase of Moore's trial. Moore submitted substantial mitigating background evidence in the state habeas corpus evidentiary hearing. That evidence has no demonstrated prejudicial or double-edged characteristics in the context of this case, and counsel failed to offer any reasonable justification for their failure to investigate whether such evidence existed. While we are troubled by counsel's complete and total failure to investigate Moore's background, despite knowledge placing counsel on notice that such an inquiry would be fruitful, our ultimate determination that counsel's failures in this regard prejudiced Moore rests heavily upon the fact that counsel also failed to use what limited mitigating evidence was readily available. Specifically, counsel failed to submit Moore's unredacted confession to the jury in support of the punishment phase argument that the shooting was accidental. Once again, counsel's omission effectively removed the only plausible defensive theory from the jury's consideration. Moreover, counsel failed to respond to the state's prejudicial and misleading arguments about the effect of Moore's penitentiary

82

package by clarifying the duration and extent of Moore's criminal history and by highlighting Moore's early release. Moore's prison record was clearly relevant on the issue of future dangerousness. *See* **Skipper**, 106 S. Ct. 1669. While merely permitting, without objection, the admission of the penitentiary package, might not have independently constituted deficient performance or created the probability of prejudice, there is a reasonable probability that counsel's failure to respond to specific misleading argument by the state about Moore's prison record impacted the outcome of the jury's deliberations on the issue of both punishment phase special issues of deliberateness and future dangerousness.

This is not a case in which the nature of the offense or the strength of the state's punishment phase evidence requires the conclusion that the specific evidence proposed by the petitioner would not have made any difference with respect to the outcome of the punishment phase. *Cf.* **Strickland**, 104 S. Ct. at 2071 (finding no prejudice where state's overwhelming presentation of evidence relating to aggravating factors supporting imposition of death penalty); **Jones v. Johnson**, 171 F.3d 270 (5th Cir. 1999) (finding no prejudice where the brutal and lengthy nature of the murder, the defendant's confessions, and the lack of other mitigating evidence required the conclusion that counsel's failure to present the proposed evidence would not have made any difference with respect to the outcome of the sentencing phase), *pet. for cert. filed*,

83

(U.S. June 17, 1999) (No. 98-9808); *Sharp v. Johnson*, 107 F.3d 282 (5th Cir. 1997) (finding no prejudice where horrendous nature of crime and circumstances would have overwhelmed mitigating evidence identified by defendant). Given the facts of this case, we have no trouble concluding that, taken together, counsel's failure to investigate Moore's proposed defense by interviewing and preparing for the state witnesses to Moore's extraneous conduct, counsel's inexplicable and illogical failure to require submission of exculpatory language in Moore's confession together with the inculpatory language submitted to the jury, counsel's damaging cross-examination of Officer Autrey, which in and of itself established most elements of the case-in-chief against Moore, and counsel's complete failure to either investigate, develop, or present available and potentially availing mitigating evidence supporting counsel's argument that the shooting was accidental, during the punishment phase of Moore's trial, including counsel's failure to offer an unredacted and available copy of Moore's purported confession in support of counsel's closing argument during the punishment phase that the shooting was accidental, are sufficient to demonstrate prejudice within the meaning of *Strickland*. Absent those inexcusable and unreasonable failures, there is a reasonable probability that the outcome of Moore's punishment phase would have been different. *Whitley*, 977 F.2d at 159; *Duhamel*, 955 F.2d at 965-66; *Wilkerson*, 950 F.2d at 1065;

84

***Profitt***, 831 F.2d at 1249.  We therefore conclude that trial counsel's cumulative errors rendered the result of Moore's punishment phase unreliable and affirm the district court's grant of relief as to punishment only.


# VII.

The district court granted the writ of habeas corpus and ordered that the state court of conviction grant Moore a new trial on the issue of punishment only.  On appeal, the Director argues that the district court exceeded its authority by ordering the state court to conduct a new punishment trial.

We agree.  A federal habeas court has the power to grant a writ of habeas corpus.  ***Duhamel***, 955 F.2d at 968.  The federal habeas court is without power, however, to order that the state conduct a new punishment hearing.  ***King***, 1 F.3d at 287.  When relief in a capital case is limited to punishment only, as in this case, the proper course is to enter an order granting the writ, but permitting the state court of conviction a reasonable period of time in which to decide whether: (1) to hold a new trial on the issue of punishment only, as permitted by TEX. CODE CRIM. PROC. art. 44.29(c), or (2) to vacate the habeas petitioner's sentence and to impose a sentence less than death.  ***Granviel v. Estelle***, 655 F.2d 673 (5th Cir. Sept. 1981); *see also* ***Whitley***, 977 F.2d at 161; ***Jones***, 788 F.2d at 1103.  We therefore remand with instructions to

85

enter such an order.

## CONCLUSION

For the foregoing reasons, the district court's determination that Moore's trial counsel rendered constitutionally deficient performance which prejudiced the outcome of the punishment phase of Moore's capital trial is **AFFIRMED** as modified by this opinion. The cause is **REMANDED** to the district court with instructions to enter an order granting the writ of habeas corpus, but conditioning the issuance of that writ upon the passage of a reasonable but certain period of time during which the state court of conviction may cure the constitutional error by vacating Moore's death sentence and imposing a sentence less than death, or by conducting a new punishment hearing pursuant to Texas Code of Criminal Procedure art. 44.29(c).